# EXHIBIT K

Page 1

Volume III
Pages 1-64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-12551-NG

FRANK SACO,                           :
          Plaintiff,                  :
                                      :
vs.                                   :
                                      :
TUG TUCANA and                        :
TUG TUCANA CORPORATION,               :
          Defendants.                 :

    CONTINUED DEPOSITION of FRANK SACO, taken on behalf of the Defendants, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Barbara M. Montijo, a Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Clinton & Muyzka, P.C., One Washington Mall, Boston, Massachusetts, on October 30, 2006, commencing at 2:00 p.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900

ORIGINAL

DUNN & GOUDREAU

```
 1        taxes since 2002?
 2   A.   Correct.
 3   Q.   Now, these deals that you have with Mr. Miles
 4        and Mr. Lane, are they structured in such a way
 5        that you would make the $17,000 threshold?
 6   A.   Huh?  Oh, I'm over 65 now.  It makes no
 7        difference.  Believe me, I still wouldn't be
 8        there.
 9   Q.   Have you talked to Mr. Lane about that?
10   A.   No, I haven't.  Well, I talked to him originally
11        about it.  He said until I was 65.
12   Q.   Mr. Lane's your accountant, correct?
13   A.   Yes.  No reason not to doubt him.  He's been
14        doing my stuff since I was 18.
15   Q.   And he continues to do it?
16   A.   He still does.  He's the town accountant.  I
17        mean, come on, I would think he'd be on the
18        level.
19                 MR. KENNEALLY:  Can we mark these?
20            (EXHIBIT 7 MARKED FOR IDENTIFICATION)
21   Q.   Mr. Saco, I want to show you what's been marked
22        as Exhibit Number 7 for identification.  Can you
23        take a look at that for me, please?
24                 MR. KEANE:  Off the record.
```

1       (OFF THE RECORD)
2       (WITNESS PERUSING DOCUMENT)
3   Q.  Do you recognize those documents?
4   A.  Yes, I do.
5   Q.  What are those documents, sir?
6   A.  Those were prepared for when I was casted up, I
7       believe, and I was being cared for at my house.
8   Q.  What's the first date indicated on that
9       document, sir?
10  A.  7/13/06.
11  Q.  As far as --
12  A.  Oh, I'm sorry.
13  Q.  -- the treatment outlined on the document, sir?
14  A.  March 3rd, '06. Transportation to/from Brigham
15      & Women's Hospital for day surgery.
16  Q.  Can you read the last date on the document for
17      me, please?
18              THE WITNESS:  On the back?
19              MR. KENNEALLY:  Yes, sir.
20  A.  April 16th, 2006.
21  Q.  Now, these are itemized charges for -- strike
22      that. These are itemized dates for services
23      rendered by a home health care certified nurse,
24      is that correct, sir?

Page 48

1  A.  Yes.
2  Q.  Who is the home health care certified nurse that
3      gives you these treatments?
4  A.  Laurie Carr.  Not treatments.
5  Q.  Is Laurie Carr your daughter, sir?
6  A.  Yes.  She's the one that works at the assisted
7      living in Beverly.
8  Q.  And those bills are for, if I can read this,
9      you said, March 3rd, 2006.  So, Laurie  drove
10     you to Brigham & Women's Hospital on that day?
11 A.  Correct.
12 Q.  Was that day surgery, sir?
13 A.  Yes.
14 Q.  And she drove you home on that day?
15 A.  Yes.
16 Q.  Was Laurie your principal driver to your
17     surgeries here in Boston?
18 A.  Most of the time.  One daughter one time.
19     Girlfriend one time.  You know, I can't
20     remember.
21 Q.  Now, did Laurie prepare lunch, breakfast, and
22     dinners as outlined in Exhibit 7?
23 A.  Yes.  She didn't come three times a day to do
24     that.  She would come and prepare meals.

```
 1  Q.  Why don't you explain that to me?  How does it
 2      work?
 3  A.  She would come on her time off, knowing that she
 4      wouldn't be paid until this mess got cleaned
 5      up.  She knew that she wasn't going to get paid
 6      for who knows how long and it was a second job
 7      for her.  It was a good way for her to save
 8      money.  Actually, I asked her about it because
 9      she was cheaper than anyone else I looked into.
10  Q.  What other facility did you look into?
11  A.  I asked around to some people and it was
12      anywheres from 25 to $40.  The home -- I don't
13      know what they charged.  You've probably got a
14      bill for that.  The home health aide nurse that
15      came or whatever.  You know, I know she was
16      pretty expensive.  And as long as Laurie came
17      and got my laundry done and got my shopping
18      done, got my meals, kept my house clean, she
19      could do it on her own hours.
20  Q.  Now, you mentioned earlier that Laurie works in
21      Beverly; is that correct?
22  A.  Yes.
23  Q.  She works with one person in Beverly?
24  A.  No, no.  She works in a home assisted living
```

Page 50

1      care facility.
2   Q. What's the name of that company?
3   A. You know what, I don't know.
4   Q. Is it in Beverly?
5   A. Yes.  It's in Monument Square; that's all I
6      could tell you.
7   Q. Do you know what street it is?
8   A. No, I don't.
9   Q. How long has Laurie been working there?
10  A. I'm saying maybe seven, eight years.
11  Q. How long has she been a certified nurse's aide?
12  A. Oh, God, since she was 17.  Probably 25,
13     30 years.  She's 45, 6, somewhere in there.
14  Q. Now, over the course of discovery in this
15     matter, your counsel also produced records for
16     services rendered by, I'm assuming, Laurie, for
17     the period of June 2nd, 2005 until October 11th,
18     2005, does that sound about right?
19  A. If that's what it says.  You had all the correct
20     information at the time I got it.
21  Q. It's your understanding that the submission of
22     those bills are for Laurie's time in assisting
23     you while you were disabled; is that right?
24  A. Correct.  And her usual charge per hour is $20

```
 1      per hour.  I think usually she gets more.
 2  Q.  How much more, do you know?
 3  A.  I don't know.  I didn't ask.
 4  Q.  You mentioned earlier that she's doing this
 5      work for yourself outside the scope of her job
 6      at this facility in Beverly?
 7  A.  Correct.
 8  Q.  Now, did Dr. Chiodo or any other doctors, like
 9      Dr. Barrett, did they prescribe this type of
10      assistance for you?
11  A.  What I did was, when I got home from the
12      hospital, or before I went, I'm saying like I've
13      got a 94-year-old mother here, I can't handle
14      that and I can't handle myself and, you know,
15      what can I do?  Whether it was my doctor, or my
16      attorney, or a friend or who it was, I don't
17      know, said you're entitled to get help.  You're
18      going to have to have someone come in and take
19      care of you for a while; and that's how it came
20      about.
21  Q.  Did Laurie help with your mom at that time?
22  A.  Laurie always helps with my mom.  She always
23      has.
24  Q.  So, when Laurie shows up on these days to help
```

| | | |
|---|---|---|
| 1 | | might have.  I know I probably mentioned it or |
| 2 | | probably brought it up because I know there was |
| 3 | | a problem between Mass. Health and Marine Safety |
| 4 | | Consultants. |
| 5 | Q. | Do you have copies of those letters yourself? |
| 6 | A. | I could look at my records. |
| 7 | Q. | Can you look for me and give them to Mr. Keane? |
| 8 | A. | Absolutely.  I can't guaranty you I'll find |
| 9 | | them, but I'm sure I probably have them. |
| 10 | Q. | So, you're going to look for letters that you |
| 11 | | sent to Mass. Health and letters that Mass. |
| 12 | | Health sent to you? |
| 13 | A. | Anything to do with Mass. Health I'll put them |
| 14 | | together and get them to Brian, hopefully.  I |
| 15 | | don't think I would throw them out.  It's just a |
| 16 | | question of digging them up, you know. |
| 17 | Q. | When was the last time you received a |
| 18 | | maintenance check? |
| 19 | A. | Two weeks ago Saturday. |
| 20 | Q. | How much was that for, sir? |
| 21 | A. | 210. |
| 22 | Q. | Have you actually paid Laurie for her |
| 23 | | treatments? |
| 24 | A. | No. |

1  Q.   Strike that.  Have you actually paid Laurie for
2       her invoices?
3  A.   No.
4  Q.   So, she expects to be paid by Marine Safety
5       Consultants or my client or our client?
6  A.   She expects to be paid from one.  It was on my
7       promise.  I didn't think it would be a big deal,
8       but I told her it might take her a while.
9  Q.   Do you have any employment opportunities lined
10      up in the next few weeks, sir?
11 A.   No, I don't.
12 Q.   Are you going to continue to search for a job?
13 A.   I have to.  I'm doing the best I can.  I'm
14      taking anything that comes my way.
15 Q.   Have you received any bills from Cape Ann
16      Physical Therapy for the treatment you've had?
17 A.   No, I haven't.  I'm sure I will be.
18 Q.   On August 2nd, 2006 you went to Dr. Chiodo,
19      which I believe was the last time you saw him,
20      does that sound correct?
21 A.   That would be right.
22 Q.   At that time he said a prescription was
23      provided, and I'm just reading from his
24      treatment note here.  Do you know what that