UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANK SACO,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              03-12551-MBB

TUG TUCANA CORPORATION,
        Defendant.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION TO INCREASE MAINTENANCE AND CURE**
**(DOCKET ENTRY # 55)**

**March 30, 2007**

**BOWLER, U.S.M.J.**

        Plaintiff Frank Saco ("Saco"), a seaman working on board the
Tug Tucana at the time of the accident, seeks to increase the
maintenance and cure paid to date by defendant Tug Tucana
Corporation ("defendant").  (Docket Entry # 55).  After filing
the motion, Saco filed an addendum clarifying a number of issues
raised in the original motion.  (Docket Entry # 59).  Defendant
opposes the motion.  (Docket Entry # 58).  After conducting a
hearing on December 21, 2006, this court took the motion to
increase maintenance and cure (Docket Entry # 55) under
advisement.

        The three count complaint seeks recovery based upon Jones
Act negligence, unseaworthiness and maintenance and cure.  In
January 2006, a jury rendered a verdict for defendant with
respect to the negligence and unseaworthiness claims.

BACKGROUND[1]

On April 13, 2003, Saco, a longtime fisherman who presently lives in Manchester, Massachusetts, was working aboard the Tug Tucana as a deckhand.  Saco had heard about the job through a friend and, more notably, was not a member of any maritime union.

While the Tug Tucana was attending barges in Beverly Harbor and heading into shore for a crew change, Saco, a member of the crew and 62 years old at the time, was in the process of moving a hawser.  While performing this task, he tripped and fell.  He sustained an injury to his right mid-foot resulting in a Lisfranc fracture.

He was taken to Beverly Hospital, X-rayed and underwent surgery the following day.  Robert M. Wood, M.D. ("Dr. Wood") performed the surgery consisting of an open reduction and internal fixation with three screws to stabilize the foot.  Saco was placed in a cast and had at least two follow up visits with Dr. Wood.

A second surgery took place on July 15, 2003, during which Dr. Wood removed the three screws.  A few weeks later, Saco began physical therapy at the Beverly Sports Medicine and Rehabilitation Center ("the rehabilitation center") in Beverly,

---

[1]  Facts are taken from the testimony and exhibits at trial as well as all of the exhibits and attachments proffered by the parties in conjunction with the motion to increase maintenance and cure.  Citations to the record are primarily provided only for direct quotations.

Massachusetts.  From August to November 2003, Saco had 26 "medically necessary" (Ex. 2)[2] physical therapy visits at the rehabilitation center.[3]  Round trip by automobile from Saco's residence to the facility is 20 miles.  During this time period, Saco continued to experience soreness and pain in his right foot. The November 13, 2003 physical therapy note describes Saco as reaching a plateau.

Saco underwent a third surgery on January 21, 2004. Hospital records reflect the diagnosis of mid-foot degenerative joint disease.  Dr. Wood performed the surgery consisting of an attempted mid-foot fusion with synthetic bone grafting material and screws.  The operative report notes the presence of degenerative joint disease.  Although X-rays taken in May 2004 revealed normal foot position and "good hardware position" (Ex. 14), Saco continued to experience pain.  Follow up visits with Dr. Wood at the Sports Medicine North Orthopedic Surgery office in Peabody, Massachusetts took place on May 13, July 1, August 19 and September 2, 2004.[4]  (Ex. H).  Notes from these visits

---

[2]  Unless otherwise noted, "Ex." refer to the exhibits admitted at trial.

[3]  The records themselves (Ex. 2) reflect 26 as opposed to the 27 visits noted by defendant (Docket Entry # 58, n. 4).

[4]  This court takes judicial notice that the distance between Manchester and Peabody is 13.34 miles.  See www.mapquest.com.; see also Gordon v. Lewistown Hospital, 272 F.Supp.2d 393, 429 n. 34 (M.D.Pa. 2003) (taking judicial notice of driving distances disclosed on mapquest); In re Extradition of

uniformly reflect Saco's continued reports of pain in the mid-foot area. A July 2004 radiology report notes the impression of a loosening of certain screws.

In 2004, Saco underwent 20 physical therapy visits at the rehabilitation center after the January 2004 surgery.[5] Saco continued to experience pain in the right foot with swelling and discoloration after walking approximately half a mile. Dr. Wood eventually advised Saco that there was nothing further that he could do. (Trial, Day 3).

On October 29, 2004, Saco had his first visit with Dr.

_____

Gonzalez, 52 F.Supp.2d 725, 731 n. 12 (W.D.La. 1999) (same); see also Marsh v. Butler County, 268 F.3d 1014, 1049 n. 3 (11th Cir. 2001) (taking judicial notice of city's location reflected on mapquest). This court also takes judicial notice that the distance between Summer Street in Manchester where Saco resides (Docket Entry # 58, Ex. B) and the Brigham and Women's Hospital at 75 Francis Street in Boston (Ex. 3) is 32.80 miles. See www.mapquest.com. Saco avers that he spent approximately $25 each week on gasoline and automobile insurance.

[5] At trial, Saco testified to having 20 physical therapy visits after the January 2004 fusion surgery. At deposition, he testified to having "[t]hree separate sets" of physical therapy sessions after each surgery all "[a]t the Beverly Hospital Rehab" in Beverly, i.e., the rehabilitation center. (Docket Entry # 58, Ex. C). The 26 visits in 2003 and the 20 visits in 2004 constitute the first and second sets of physical therapy sessions. The record does not contain physical therapy records for visits in 2005. At trial, Christopher P. Chiodo, M.D. ("Dr. Chiodo"), a board certified orthopedic surgeon at the Brigham and Women's Hospital in Boston, testified that Saco underwent physical therapy for a six week period after removal of the cast. Drawing reasonable inferences from the record, this court finds that Saco had 26 physical therapy visits in 2003, 20 physical therapy visits in 2004 and six weeks of physical therapy in 2005. These three sets of physical therapy visits took place at the rehabilitation center which is a 20 mile round trip from Saco's residence. (Docket Entry # 58, Ex. C).

Chiodo.  Saco complained of persistent pain in the mid-foot which became worse with walking.  Dr. Chiodo ordered a computer assisted tomography scan ("CT scan") to assess the status of the fusion.  Saco had a follow up visit with Dr. Chiodo on November 2, 2004.

The November 2, 2004 CT scan indicated a nonunion at two joints.  Accordingly, Saco underwent a fourth surgery on June 2, 2005, consisting of a removal of the old hardware, a bone graft and an attempted second fusion with a screw and a plate.  Dr. Chiodo performed the surgery at the Faulkner Hospital in Boston.  The operative report notes the existence of a gross nonunion at one joint and the appearance of a union at another joint.

On June 14 and 28, 2005, Saco had follow up visits with Dr. Chiodo at the Brigham and Women's Hospital.  At that time, Saco was experiencing a "[s]atisfactory postoperative course" albeit with a hematoma underneath the right knee at the bone graft donor site.  (Ex. 3).

Dr. Chiodo conducted another follow up examination of Saco at the Brigham and Women's Hospital on July 19, 2005.  Radiographs taken that day[6] revealed "excellent apposition and

_____

[6]  Like a number of the other radiology reports, the report is on Faulkner Hospital stationary.  Dr. Chiodo's notes for visits the same day reflect his position as a member of the Orthopedic Surgery Department at the Brigham and Women's Hospital.  This court draws the reasonable inference that the visits took place at either the Brigham and Women's Hospital or the Faulkner Hospital.  In any event, even if the visits took place the Faulkner Hospital on Centre Street in Boston, the

hopefully healing of the fusion," according to Dr. Chiodo's medical note. (Ex. 3). Saco was placed in another cast and instructed to remain non-weight bearing for six weeks.

Additional radiographs taken on August 30, 2005, showed continued healing. During the follow up visit that day with Dr. Chiodo at the Brigham and Women's Hospital, Saco reported "no pain." (Ex. 3). Dr. Chiodo placed Saco into a walking boot cast with instructions to wean himself from crutches during the next four weeks.

On October 11, 2005, Dr. Chiodo conducted another examination at the Brigham and Women's Hospital. Describing Saco as "doing extremely well," Dr. Chiodo gave Saco a prescription for an orthotic. (Ex. 3). Radiographs showed continued healing of the fusion. Saco reported "mild aching with ambulation" and continued improvement. (Ex. 3).

On October 26, 2005, Sally Rudicel, M.D. ("Dr. Rudicel"), an Associate Professor of Orthopedic Surgery at Tufts New England Medical Center, conducted an independent medical examination of Saco. In her opinion, he was not at an end point of maximum medical improvement, because "[t]he usual time to maximum medical improvement after a mid-foot fusion is 1 year." (Ex. 5).

During the December 13, 2005 visit with Dr. Chiodo, Saco reported persistent pain at the proximal end of the plate.

---

location would not materially effect the mileage calculation.

Looking at the CT scan taken that day, Dr. Chiodo felt that the majority of the fracture was healed.  Saco was experiencing persistent pain and he agreed to undergo a fifth surgery to remove the plate.

On March 3, 2006, Dr. Chiodo performed the surgery to remove the plate.  The record fails to contain an order that Saco was not ambulatory after the surgery or was ordered to remain off his feet.  Laurie Carr ("Carr"), a certified nurse's aide, drove Saco to and from the Brigham and Women's Hospital for the surgery.  She charges $20 per hour.  Having been a certified nurse's aide for the past 25 years, Carr presently works at an assisted living facility in Beverly.

From March 3 to April 16, 2006, Carr spent a total of 196.5 hours caring for Saco at his home.[7]  During these visits, Carr spent an undetermined amount of time assisting Saco's 94 year old mother.  In addition to the hours spent transporting Saco to and from the Brigham and Women's Hospital on March 3 and 21, 2006,[8] Carr's tasks included preparing meals, doing laundry, cleaning, removing trash, shopping for food, changing bed linens and going

---

[7]  Carr also assisted Saco from June 2 to October 11, 2005. In response to invoices received for the June to October 2005 time period, defendant alleges that it paid Saco $430.  The present motion seeks reimbursement or payment for Carr's services for the March 3 to April 16, 2006 time period in the total amount of $3,930.

[8]  Defendant expresses a willingness to pay $80 for Carr's transportation services on March 21, 2006.

7

to the post office and drugstore.  Neither Dr. Chiodo nor any other doctor prescribed this type of assistance for Saco after the March 2006 surgery.[9]  Saco testified that he needed the assistance because when he came home from the hospital he could not handle these tasks himself.  Significantly, Saco avers that he "incurred" bills for Carr's services and attaches a list of the amounts, dates and nature of the services provided.[10]  Saco seeks a payment for these services at the charged hourly rate of $20 for a total amount of $3,930.

After the March 2006 surgery, Saco continued to experience pain.  At an August 2, 2006 follow up visit with Dr. Chiodo at the Brigham and Women's Hospital, Dr. Chiodo noted that radiographs "show what appears to be a solid fusion."  (Docket Entry # 59, Ex. 2).  Saco had a normal gait but continued to report mild pain when "he is on his foot for any prolonged period of time."  (Docket Entry # 59, Ex. 2).  Dr. Chiodo also stated, albeit somewhat equivocally, that, "At this point, I suspect that [Saco] has some deconditioning and perhaps he may benefit from some rehab with conditioning and range of motion exercises."

---

[9]  Rather, Saco testified to a belief that he needed to have someone come in and take care of him.  Moreover, he did not know the identity of the person who said that he was entitled to help, i.e., whether it was "my doctor, or my attorney, or a friend or who it was."  (Docket Entry # 58, Ex. K).

[10]  Although not a model of clarity, Saco's averment states that, "During my period of convalescence I used the services of a Home Health Aide.  The bills incurred as a result of this aide are $3930."  (Docket Entry # 55, Ex. A).

(Docket Entry # 59, Ex. 2).  Dr. Chiodo provided Saco with a prescription for conditioning exercises for the right foot.

Saco underwent three weeks of physical therapy.  The therapy improved his gait to the degree that he was able to walk on the beach for one or two hours, according to Saco.  Physical therapy terminated, however, because the insurer refused to cover the cost.  (Docket Entry # 58, Ex. J).[11]

On October 4, 2006, Hyman Glick, M.D. ("Dr. Glick"), a board certified orthopedic surgeon, conducted an independent medical examination of Saco.  After an exhaustive recitation of the medical records, a summary of Saco's statements during the examination, a review of numerous X-rays and a physical examination, Dr. Glick opined that the pain Saco continues to experience was not unusual or inconsistent with the nature of his injury.  Consistent with Dr. Chiodo, Dr. Glick believed that the repeat fusion surgery achieved a solid fusion.  According to Dr. Glick, Saco has a loss of hindfoot inversion, a stiffness in his large right toe and a 12% impairment of his right foot.  Dr. Glick opined that, "He is at a medical end result and his condition is not likely to change or benefit from further surgery."  (Docket Entry # 58, Ex. J, p. 12).  Dr. Glick's report includes Saco's statement that the three weeks of physical

---

[11]  Saco's admissions are taken from the report of Hyman Glick, M.D. which defendant proffered as an attachment to its opposition.  This court does not accept other portions of the medical background for the truth of the matter asserted.

therapy prescribed by Dr. Chiodo in August 2006 "had really been helping" and that "[h]is gait had improved." (Docket Entry # 58, Ex. J, p. 8). Dr. Glick nonetheless "doubt[ed] that additional physical therapy is going to improve [Saco's] result." (Docket Entry # 58, Ex. J, p. 12). He provides convincing support for this finding.

Saco avers to spending $962 on rent each month. (Docket Entry # 55, Ex. A). He lives with his 94 year old mother in an apartment in Manchester. Saco's mother, however, pays half of the rent each month. Saco therefore pays a total of $481 each month on rent. The rent includes the cost of heating the apartment.

Saco also attests to paying utilities, consisting of "electric, oil and water" in the amount of $5 a day or $150 a month.[12] (Docket Entry # 55, Ex. A). The foregoing amount includes payment for his mother who does not contribute to this amount. In arriving at this figure, Saco did not review any invoices but, instead, estimated the $150 monthly amount. At the October 2006 deposition, he could not "remember back what" this amount "pertained to" but that his "electric bill doesn't run that, but I was probably led to believe it was cable,[13] phone,[14]

---

[12]  Saco made this averment in August 2006.

[13]  As part of the evidence to support the request for "utilities" Saco includes invoices from Adelphia which advertises that "on-demand just got even better with 'FREE MOVIES.'"

this and that."   (Docket Entry # 58, Ex. B).

Neither telephone charges nor satellite cable television charges are properly included as maintenance.  See Hall v. Noble Drilling, Inc., 242 F.3d 582, 587 n. 17 (5th Cir. 2001) ("expenses, such as telephone service, clothing, toiletries, and travel, are not part of maintenance"); Smith v. Delaware Bay Launch Service, Inc., 972 F.Supp. 836, 849 (D.Del. 1997) ("maintenance clearly does not cover . . . telephone bills"); Gillikin v. United States, 764 F.Supp. 270, 273 (E.D.N.Y. 1991) (telephone bill may not be recovered as maintenance).[15] Resolving doubts and ambiguities in the record in Saco's favor, see Vaughan v. Atkinson, 369 U.S. 527, 532 (1962) (ambiguities or doubts regarding seaman's right to maintenance and cure "are to be resolved in favor of the seaman"),[16] in the course of

---

(Docket Entry # 58, Ex. D).

[14] The only evidentiary support for the telephone charges consists of a December 2005 check payable to Verizon for $30. (Docket Entry # 58, Ex. D).  Presumably, the amount reflects a monthly charge.

[15] The court's discussion of food and lodging in Hall indicates a rejection of the two seamen's request to include "$11.09 in telephone and satellite TV" charges as part of maintenance and cure.  See Hall v. Noble Drilling, Inc., 242 F.3d at 587-593.  Inasmuch as "[m]aintenance is intended to substitute for the food and lodging that a seaman enjoyed at sea," Barnes v. Andover Co., L.P., 900 F.2d 630, 641 (3rd Cir. 1990), telephone and television charges are not included as integral elements of such lodging.  See generally Gillikin v. United States, 764 F.Supp. at 273.

[16] The Supreme Court's decision in Atkinson more fully explains that:

11

reviewing the record as a whole, this court finds that Saco incurred utility charges of $5 per day only for "electric, oil and water" (Docket Entry # 55, Ex. A, ¶ 8) as opposed to electric, oil, water, telephone and cable television.  This court finds that Saco paid utilities consisting only of electric, oil and water in the monthly amount of $150 or the daily amount of $5 for himself and his mother.

Saco avers to spending $100 each week or $400 a month for groceries.  His mother does not purchase her own food.  She does, however, contribute "a little bit" to the cost of food when Saco's brother occasionally buys her a bottle of milk or a loaf of bread.  (Docket Entry # 58, Ex. B).

With respect to gasoline and automobile insurance, Saco asseverates that he spent $25 a week on gasoline and automobile insurance "[w]hile [he] was attending physical therapy and medical appointments."  (Docket Entry # 55, Ex. A).  Saco did not

------

Admiralty courts have been liberal in interpreting this duty "for the benefit and protection of seamen who are its wards."  Id., at 529, 58 S.Ct. at 654.  We noted in Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 933, 934, 87 L.Ed. 1107, that the shipowner's liability for maintenance and cure was among "the most pervasive" of all and that it was not to be defeated by restrictive distinctions nor "narrowly confined."  Id., at 735, 63 S.Ct. at 936.  When there are ambiguities or doubts, they are resolved in favor of the seaman.  Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503.

Vaughan v. Atkinson, 369 U.S. at 531-532.

contest the $25 weekly amount at his deposition.[17]  (Docket Entry # 58, Ex. C, p. 53).

Trips to the physical therapy facility took place at an approximate rate of two per week.[18]  (Docket Entry # 58, Ex. C). As previously indicated, Saco underwent 26 physical therapy visits in 2003 and 20 physical therapy visits in 2004.  At the estimated number of two visits per week, Saco underwent 23 weeks of physical therapy.  Adding the six weeks of physical therapy in 2005,[19] Saco underwent 29 weeks of physical therapy expending an estimated $25 per week on gasoline and insurance.  Saco also underwent three weeks of physical therapy in 2006 at an undetermined location.[20]

---

[17]  Saco's motion and addendum allege $30 as the weekly amount.

[18]  Saco testified to going "[t]wo, three times a week, something like that" as well as "mostly three" times per week. (Docket Entry # 58, Ex. C, p. 54).  A review of the physical therapy records for 2003 shows that Saco went two times per week for the majority of the visits.  (Ex. 2).

[19]  See footnote five.

[20]  This court finds that Saco underwent the three weeks of physical therapy in 2006 prior to the date of Dr. Glick's October 4, 2006 examination.  The record, however, fails to indicate the location of the physical therapy facility and, hence, the mileage.  Saco's affidavit containing the averment of spending $25 a week on gasoline and insurance to travel to physical therapy appointments is dated August 9, 2006, only seven days after he obtained the prescription for the physical therapy from Dr. Chiodo.  At the October 2006 deposition, Saco testified to undergoing three as opposed to four sets of physical therapy. (Docket Entry # 58, Ex. C).  Defendant alleges that the visits in 2006 took place at a facility in Manchester.  (Docket Entry # 58, n. 4).  Accordingly, this court finds insufficient evidence to

13

Trips for medical appointments to Dr. Wood include two follow up visits after the initial surgery, the second and third surgeries and four follow up visits after the third surgery. Including surgeries, Saco visited Dr. Chiodo 12 times all on different weeks as set forth in the medical records.[21]  (Ex 3).

At Saco's deposition, he could not explain how the $25

---

support a finding that Saco incurred $25 a week in gasoline and insurance during the three weeks he attended physical therapy between August 2 and the October 4, 2006 examination by Dr. Glick.

[21]  This court takes judicial notice that the round trip distance between Dr. Chiodo's offices in Boston and Saco's residence in Manchester is more than twice the 20 mile round trip to the rehabilitation center, see fn. 4, thereby accounting for the $25 weekly cost for the one visit with Dr. Chiodo as opposed to the $25 weekly cost for the two visits for physical therapy. All of these trips were necessary health care visits thereby resulting in necessary expenses for gasoline and automobile insurance to and from these visits.

The $25 averred weekly cost for gasoline and insurance for the eight weeks of visits to Dr. Wood is more problematic given the 13.34 mile one way distance.  Logically, Saco would not incur the same amount for travel to and from the longer distance to visit Dr. Chiodo than the shorter distance to visit Dr. Wood. Likewise, given the similarity in distance between a round trip visit to Dr. Wood and a round trip visit to the rehabilitation center for physical therapy, it is illogical that Saco would spend $25 for two round trips to the rehabilitation center and the same amount for one round trip to visit Dr. Wood.  Mindful of the deficiencies noted in the next paragraph, Saco fails to establish the expenses for the trips to Dr. Wood's office even accepting that his burden is, as he urges, "'feather light.'" See Hall v. Noble Drilling, Inc., 242 F.3d at 589; Gillikin v. United States, 764 F.Supp. at 267.  In other words, there is insufficient evidence to establish the actual cost of travel for Saco's visits to Dr. Wood.  See, e.g., Norfolk Dredging Co. v. Wiley, 450 F.Supp.2d 620, 627 (E.D.Va. 2006) (denying payment for necessary travel expenses to and from medical appointments because the plaintiff failed to quantify the number of visits he made to each medical office and provide an adequate calculation of the total miles traveled).

amount was calculated.  He also did not "know how the insurance of my vehicle got in [the $25 figure]."  (Docket Entry # 58, Ex. C).  He obtains automobile insurance from Plymouth Rock Assurance Company.  An invoice dated January 3, 2004, from the company for the policy period of January 1, 2004 to January 1, 2005 reflects a previous balance of $1,314.[22]

Saco retains the ability to climb stairs, walk and drive. He has been on his boat two or three times since the accident. He cannot stand or walk for any prolonged period of time, however, without experiencing pain and discoloration in his right foot.

Saco can work in a sedentary position and in or around June 2006 he applied for a position as a security guard.[23]  In the four or five months prior to his October 2006 deposition, Saco painted shutters and banisters at various homes five or six times with a friend.  Saco was able to take his time with the painting work.

---

[22]  Each of the other invoices from the company reflect coverage for two insured vehicles.  The estimated renewal premium for both vehicles is $2,546 for the January 2006 to January 2007 policy period.  (Docket Entry # 58, Ex. D).  The evidence to support that Saco spent $25 per week on gasoline alone and $1,202 annually on automobile insurance is decidedly weak.  Given his averment that he spent $25 per week inclusive of both gasoline and insurance, this court finds that defendant more than adequately refutes the alleged $1,202 amount purportedly spent annually on automobile insurance above and beyond the insurance included in the $25 per week figure.

[23]  He has not been contacted to perform the job.

He also recalls earning a "couple of hundred bucks" by assisting a friend in catering work on two occasions in 2006. Saco worked as a barber after he graduated from high school. Saco would require additional schooling to reinstate his license in order to work as a barber at the present time. Since the accident, Saco no longer works as a lobsterman. He presently leases his vessel to Frank Miles ("Miles"), the husband of Saco's stepdaughter. Miles pays Saco $300 from January to June and $600 from June to December toward the $40,000 purchase price of the vessel. As of October 2006, Miles had made payments totaling $4,900.

In August 2006, Saco sold his Massachusetts fishing permit to Daniel Lane ("Lane"). As of October 2006, Lane had paid $6,500 towards the $12,500 purchase price.

Saco's mother receives monthly income from social security benefits in the amount of $1,201. Saco receives monthly income from social security disability payments in the amount of $735.

DISCUSSION

While not dividing the requested expenses as falling under "maintenance" or under "cure," Saco asks to increase the $23,900 payments made to date by defendant to include the following

16

items:  (1) half of the $962 monthly rent;[26] (2) "utilities" in
the amount of $5 per day; (3) food in the amount of $100 per
week; (4) gasoline in the amount of $30 per week; (5) automobile
insurance in the amount of $1,202 a year; and (6) meal
preparation, laundry and bed linen services, trash removal, house
cleaning, food shopping, post office trips and drug store trips
performed by Carr from March 3 to April 16, 2006, in the amount
of $3,930.[27]  (Docket Entry ## 55 & 59).

Defendant initially presents two overriding issues.  First,
it submits that Saco reached a point of maximum medical
improvement or medical end result on October 4, 2006, the date of
Dr. Glick's examination.  Accordingly, defendant terminated
maintenance and cure payments in October 2006 and presently seeks
to avoid any additional obligation thereafter.  Asserting that he
has not reached an end medical state, Saco maintains that
defendant remains obligated to provide additional payments to
date as well as into the future.

Second, defendant submits that the $20 daily maintenance

---

[26]  The initial motion seeks rent in the amount of $962 a
month.  In the more recently filed addendum to the motion, Saco
requests only half of the $962 monthly rent, to wit, $481.
Accordingly, inasmuch as the addendum is the more recent filing
representative of Saco's current position and Saco's mother paid
half of the $962 amount, this court need not address the
propriety of halving or prorating the rent.

[27]  The $3,930 figure also includes time spent by Carr
transporting Saco to medical appointments at the Brigham and
Women's Hospital on March 3 and 21, 2006.

rate set in a Collective Bargaining Agreement applicable to the pipe laying project performed in Beverly harbor applies.[28] Pointing out that he is not a member of a union, Saco asserts that the $20 rate does not apply. Before examining the particular expenses claimed, this court addresses these two arguments seriatim.

The "core purpose" of maintenance and cure is "palliating the disadvantages of seafaring life." LeBlanc v. B.G.T. Corporation, 992 F.2d 394, 397 (1st Cir. 1993). The term "refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery from an injury or malady." Id. The right is curative in nature, Id., and continues "until the seaman is 'so far cured as possible.'" Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 454 (1st Cir. 1996). "When a seaman's 'condition has stabilized and further progress ended short of a full recovery, the seaman . . . is no longer entitled to maintenance and cure.'" Whitman v. Miles, 387 F.3d 68, 72 (1st Cir. 2004). Conversely, when medical treatment "is 'more than simply palliative, and would improve the seaman's medical condition,'" the obligation to provide maintenance and cure continues. Id. (denying maintenance and cure on the basis

---

[28] This court accepts for present purposes that the Tug Tucana was performing work associated with this project inasmuch as Saco does not contend otherwise.

that slowing or arresting the medical condition, in this instance
multiple sclerosis, by a drug "'is not the same as effecting an
improvement'"). The boundary between improvement in the
underlying medical condition and palliation is oftentimes
"fuzzy." In re RJF International Corporation for Exoneration,
354 F.3d 104, 106-107 (1st Cir. 2004).

 "[M]aximum medical recovery" constitutes the dividing line
which, when reached, allows the shipowner to terminate
maintenance and cure. Id. at 107 (further explaining that a
permanent injury does not automatically terminate benefits);
accord Whitman v. Miles, 387 F.3d at 72; see also Smith v.
Delaware Bay Launch Service, 972 F.Supp. 836, 848 (D.Del. 1997)
(recognizing that "shipowner has the burden of proving that
maximum cure has been reached"). Continued treatment simply to
alleviate pain associated with an underlying condition that is
permanent and that cannot be further improved is not encompassed
in the maintenance and cure obligation. See In re RJF
International Corporation for Exoneration, 354 F.3d at 106-107.
As aptly and cogently summarized by a Fifth Circuit case quoted
in RJF International, "'where it appears that the seaman's
condition is incurable, or that future treatment will merely
relieve pain and suffering but not otherwise improve the seaman's
physical condition, it is proper to declare that the point of
maximum cure has been achieved.'" Id. at 106 n. 1 (quoting

Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979)).

Closely examining the purpose for which Dr. Chiodo prescribed the conditioning and rehabilitation exercises in August 2006 in the context of the RJF opinion's discussion of Farrell v. United States, 336 U.S. 511 (1949), and Vella v. Ford Motor Co., 421 U.S. 1 (1975), is instructive. Dr. Chiodo prescribed the exercises for right foot weakness and deconditioning. The accompanying note for the August 2, 2006 examination reflects that Saco "feels that his foot is weak and stiff" and "still reports some mild pain." (Docket Entry # 59, Ex. 1). Notably, Dr. Chiodo's physical examination showed "a normal gait." Id. Dr. Chiodo's assessment of a normal gait contrasts with Saco's perceived improvement in gait from the subsequent physical therapy. Dr. Chiodo further stated that "radiographs show what appears to be a solid fusion." Id. The exam also revealed "satisfactory alignment" of the foot, according to Dr. Chiodo. Id.

Hence, the purpose for prescribing the rehabilitation and conditioning exercises was not to improve Saco's gait or foot alignment or increase the healing of the fusion. Rather, Dr. Chiodo prescribed the exercises to alleviate the mild pain Saco reported and to accommodate Saco's belief that his foot was weak.

Similarly, the First Circuit in RJF distinguished the Farrell and Vella cases, which approved the termination of

20

maintenance and cure for the medically diagnosed permanent injuries notwithstanding continued pain or dizziness spells, because the purpose for the ongoing medical care in <u>Farrell</u> and <u>Vella</u> was not to improve the underlying condition.  <u>In re RJF International Corporation for Exoneration</u>, 354 F.3d at 107. Here, as in <u>Farrell</u> and <u>Vella</u>, the purpose for Dr. Chiodo's prescription was to alleviate the mild pain in Saco's right foot. In addition, the description of the plan set forth in the medical note reflects Dr. Chiodo's ambivalence that the exercises might not help the pain or the stiffness in the foot.  (Docket Entry # 59, Ex. A; "At this point, I suspect that [F]rank has some deconditioning and *perhaps* [emphasis added] he may benefit from some rehab").

The fact that Saco had reached the point of maximum medical recovery by October 2006 gains additional support from Dr. Glick's report.  After thoroughly and comprehensively reviewing the medical record and examining Saco, Dr. Glick gave a well supported opinion that Saco was "at a medical end result." (Docket Entry # 58, Ex. J).  Dr. Glick additionally opined that neither further surgery nor additional physical therapy would improve Saco's condition.

Finally, Dr. Rudicel opines that the usual time period to reach the point of maximum medical improvement after a mid-foot ankle fusion surgery is one year.  Saco's second and final such

surgery took place in June 2005.

Accordingly, this court concludes that Saco had reached the point of maximum medical recovery at the time of Dr. Glick's October 4, 2006 examination.  Defendant properly terminated maintenance and cure benefits in October 2006.

Turning to defendant's next argument, defendant urges this court to apply the $20 daily rate set in the Collective Bargaining Agreement.  Historically, the obligation to provide maintenance and cure arose to alleviate the "irresponsible behavior of shipowners who set disabled seamen ashore at foreign ports to shift for themselves."  Macedo v. F/V Paul & Michelle, 868 F.2d 519, 521 (1st Cir. 1989).  "The modern reality," however, "is that most seamen are no longer 'friendless'" having gained strength from union membership and the concomitant representation by union leaders constantly pressing for better working conditions, pay and benefits.  Ammar v. United States, 342 F.3d 133, 146 (2nd Cir. 2003).  Collective bargaining agreements are therefore an appropriate means to set a daily maintenance rate for union members.  Macedo v. F/V Paul & Michelle, 868 F.2d at 522; accord Ammar v. United States, 342 F.3d at 143 ("First, Fifth, Sixth, Ninth, and Eleventh Circuits" hold "that a seaman who is a member of a union that has agreed to a specified daily rate of maintenance is, despite having incurred higher actual costs, limited to recovery of that rate").

The First Circuit in Macedo, however, cited to Incandela v. American Dredging Co., 659 F.2d 11, 13 (2nd Cir. 1981), and noted that the Incandela court "rejected the union rate because plaintiff was not a union member."  Consequently, the Macedo court intimated in dicta that the union rate would not apply where, as here, the seaman was not a member of the union. Indeed, the Third Circuit in Barnes v. Andover Co., L.P., 900 F.2d 630, 636-637 (3rd Cir. 1990), explained that the First Circuit in Macedo distinguished the situation of a nonunionized seaman.  Following this lead, Saco is not limited to the contractual maintenance rate set in the Collective Bargaining Agreement.

Absent use of the daily rate in the Collective Bargaining Agreement, defendant concurs with Saco that he is entitled to receive the actual expenses incurred for maintenance and cure up to the reasonable amount for his locality.  (Docket Entry # 58, p. 10; Docket Entry # 55, p. 3).  The parties' position comports with the applicable law.  See Hall v. Noble Drilling, Co., 242 F.3d at 590 ("the general rule is that seamen are entitled to maintenance in the amount of their actual expenses on food and lodging up to the reasonable amount for their locality"); see also Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454.  This court therefore turns to the expenses that Saco actually incurred and presently seeks to include as part of the requested increase

in maintenance and cure.[29]

Saco requests reimbursement of $481 in monthly rent.  It is beyond dispute that maintenance includes provision for and payment of lodging.  See Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454 (maintenance refers to "'provision of, or payment for, food and lodging ("maintenance")'").  Saco incurred the $481 amount during the April 2003 to October 2006 period.  As a reasonable expense, Saco is entitled to the requested monthly amount of $481 or a daily amount of $15.81.[30]

Maintenance also encompasses the actual cost of food up to the reasonable amount in the locality.  Id.  Saco seeks the monthly amount of $400 for food.  Defendant, however, correctly points out that the right to maintenance and cure is personal. See Macedo v. F/V Paul & Mitchell, 868 F.2d at 522 (maintenance is for the seaman's own personal expenses and not for the support of his family).  Simply put, "Maintenance provides only for the expenses of the seaman."  Hall v. Noble Drilling, Co., 242 F.3d at 589.  A seaman may therefore "only present expenditures of food eaten by himself."  Id.  Prorating is appropriate where, as

---

[29]  Entitlement to maintenance and cure additionally requires the seaman to be "'in the service of the ship' at the time of the injury."  Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454.  To state the obvious, Saco was performing a shipboard task at the time of the fall and was therefore in the service of the Tug Tucana.

[30]  The $481 monthly figure yields an annual total of $5,772. Divided by 365 days, the annual rental amount results in the daily amount of $15.81.

here, "a division of family food expenses is difficult." Id.

Absent a more exact measure, the "most reliable means" for prorating the cost of food is to apportion the total amount into "equal portions to each member of the household." Gillikin v. United States, 764 F.Supp. at 272.  Thus, although Saco paid the bulk of the expense for food, he lived with his mother.  Under the circumstances, therefore, he is entitled to receive only the prorated half of the $400 monthly amount or $200.  The $200 amount is reasonable and results in a daily amount of $6.58.[31]

Saco incurred $5 per day in actual expenses for utilities. Such utilities consist of the electric, oil and water costs for the apartment he resides in with his mother.  Such costs are properly included in the cost of lodging, i.e., maintenance. See, e.g., Hall v. Noble Drilling, Co., 242 F.3d at 589 n. 17; Smith v. Delaware Bay Launch Service, Inc., 972 F.Supp. at 849 ("home maintenance expenses, such as utilities . . . , fall into the category of lodging").  Defendant again asks to prorate the amount to $75 per month as opposed to the requested $150 per month.

As explained by the Fifth Circuit in Hall, lodging expenses for the cost of heat, electricity and water present a more difficult prorating issue than the cost of food.  Id. at 589.

---

[31]   The $200 monthly figure for a 12 month period yields an annual total of $2,400.  Divided by 365 days, the annual amount results in the daily amount of $6.58.

Where appropriate, such costs may be prorated.  See Id. at 589 n. 31 ("[c]osts of heat, electricity, and water, to the extent such expenses vary with the number of people in the household, can be prorated").  It is nonetheless inappropriate to prorate the cost of electricity, water and oil for the apartment if Saco would incur the expenses if he lived in the apartment alone.  See Id. at 589 ("[i]f a seaman would incur the lodging expenses of the home even if living alone, then the entire lodging expense represents the seaman's actual expenses").  Resolving doubts in Saco's favor, see Vaughan v. Atkinson, 369 U.S. at 532-533, but still recognizing that he has the burden to produce evidence of his expenses, Smith v. U.S., 943 F.Supp. 159, 171 (D.R.I. 1996); Incandela v. American Dredging Co., 659 F.2d at 14; see also Whitman v. Miles, 387 F.3d 68, 74 (1st Cir. 2004), this court finds that Saco would incur these costs even if he lived alone. The $5 amount is "relatively modest" and there is little indication that the cost of the electricity, oil and water "significantly increased because of the presence of" Saco's mother.  Clifford v. Mt. Vernon Barge Service, Inc., 127 F.Supp.2d 1055, 1059 (S.D.Ind. 1999) (refusing to prorate electric and gas bill because cost was modest and bill gave no indication that presence of wife and child "significantly increased" the cost).  Saco is therefore entitled to a daily amount of $5 for utilities.

As previously noted, Saco had actual expenses for gasoline and automobile insurance in the weekly amount of $25 during the 29 weeks of medically necessary physical therapy appointments and the 12 visits to Dr. Chiodo. As previously explained, this court declines to award a separate and additional amount over and above this figure for $1,202 a year for automobile insurance.

The cost of gasoline and insurance is not encompassed within the scope of maintenance but may be included as an expense under cure. Barnes v. Andover Co., L.P., 900 F.2d 630, 644 (3rd Cir. 1990) ("maintenance should not include Barnes' automobile expenses (gas, oil and insurance) or his toiletries"); Wininger v. Hendry Corp., 1999 WL 33218593 at * 1 n. 1 (M.D.Fla. Oct. 22, 1999); Smith v. Delaware Bay Launch Service, Inc., 972 F.Supp. at 849 (gasoline, oil and insurance "for the sole purpose of obtaining medical care fall into the category of cure"). Cure consists of "payment of medical expenses incurred in treating the seaman's injury or illness." Deisler v. McCormack Aggregates, Co., 54 F.3d 1074, 1079 (3rd Cir. 1995); see also Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454 (cure refers to "necessary health-care expenses"). A shipowner's duty to provide cure therefore "includes reimbursement of reasonable travel expenses to and from medical care." Norfolk Dredging Co. v. Wiley, 450 F.Supp.2d 620, 627 (E.D.Va. 2006).

Saco's evidence to support the requested $25 weekly amount

for the physical therapy visits and the visits to Dr. Chiodo is weak.  See, e.g., Id. (denying payment for travel expenses because the plaintiff failed to quantify the number of visits and provide a calculation of total miles).[32]  Saco's deposition testimony wherein he could not explain the calculation of the $25 sum casts doubts on the reliability of the averment that he spent $25 each week while attending physical therapy and medical appointments.  He also fails to aver that the money spent on gasoline and insurance was spent solely for the medical visits as opposed to personal errands or visits to relatives.  See Smith v. Delaware Bay Launch Service, Inc., 972 F.Supp. at 849 ("maintenance clearly does not cover items such as . . . trips to visit relatives" and further noting that maintenance and cure excludes all automobile expenses except those "incurred for the sole purpose of obtaining medical care").  Nonetheless, Saco testified to the 20 mile round trip travel to attend physical therapy appointments and avers that he was spending an estimated $25 a week on gasoline and insurance while attending physical therapy and medical appointments.[33]  Saco's averment

---

[32]  As previously noted, Saco fails to provide sufficient evidence to support the travel expenses for visits to and from Dr. Wood.

[33]  Saco does not aver that he spent the $25 on gasoline and insurance solely for the trips to the physical therapy and medical appointments.  Based upon the entire record, which includes Saco's medical condition and his testimony at trial regarding his activities, this court draws this inference in his favor.

distinguishes this case from the plaintiff's testimony in <u>Macedo</u> wherein the court questioned Macedo's unsupported belief that the union paid only 80% of his medical benefits and he could not recall the amounts. See <u>Macedo v. F/V Paul & Mitchell</u>, 868 F.2d at 522. Resolving doubts in Saco's favor, <u>see Vaughan v. Atkinson</u>, 369 U.S. at 532-533, this court finds that Saco incurred actual expenses in the amount of $25 per week for gasoline and automobile insurance to attend physical therapy and medical appointments for the 29 weeks he attended physical therapy appointments and for each of the 12 visits to Dr. Chiodo in Boston. Given the reasonableness of such expenses, Saco is therefore entitled to receive $1,025 (41 weeks at $25 per week) in cure as reimbursement for such travel expenses to these medically necessary appointments.

The final area of disagreement concerns Carr's services. Defendant challenges these services because Saco did not incur or pay for the services and the services were not necessary. Addressing the first argument, defendant correctly points out that Saco has not paid Carr for her services.

It is true that maintenance entitles a seaman "only to expenses actually incurred." <u>Barnes v. Andover Co., L.P.</u>, 900 F.2d at 641; <u>accord Smith v. Delaware Bay Launch Service, Inc.</u>, 972 F.Supp. at 849. Payment, however, is not necessarily required to show that the seaman incurred the expense. Where, as

here, the seaman did not pay the relative for the service, the

seaman must show that "he had promised that he would and was

obliged to do so." Barnes v. Andover Co., L.P., 900 F.2d at 641;

accord Smith v. Delaware Bay Launch Service, Inc., 972 F.Supp. at

849 (there must be "both a promise and an obligation to repay").

Saco's circumstances resemble those at issue in McCormick

Shipping Corporation v. Duvalier, 311 F.2d 933, 934 (5th Cir.

1963), wherein the court upheld a maintenance award for the

seaman because "there was an expressed intention of the [seaman]

to make payment and an expectation of her cousin to receive it."

Duvalier, who spent time convalescing in the cousin's home,

testified that:

> she expected to pay her cousin for the maintenance and care
> she had received "out of whatever money I have." She said
> "I told them whatever I would get, I would just give them
> some of the money." The cousin testified that the appellee
> had promised to give her something and she expected
> something.

McCormick Shipping Corporation v. Duvalier, 311 F.2d at 934.

Duvalier expected to pay her cousin out of whatever money she

received from the shipowner. Id. Likewise, Saco testified that

Carr "expects to be paid by Marine Safety Consultants or

[defendant.]" (Docket Entry # 58, Ex. K). Furthermore, the

expectation "was on [Saco's] promise." (Docket Entry # 58, Ex.

K).

In addition to Saco's deposition testimony, he avers that he

"incurred" bills and attaches an itemized list of the amounts,

dates and nature of the services provided by Carr to the
affidavit.  In particular, he attests that he used Carr's
services during the period of convalescence and that, "The bills
incurred as a result of this aide [referring to Carr] are
$3930.00."  (Docket Entry # 55).

This court therefore finds that Saco incurred the expense
for the services listed and performed by Carr.  Whether the
services were necessary, however, presents a separate issue.
Quoting and relying on Ferrara, defendant submits that Carr's
services do not constitute "'necessary health-care expenses.'"
(Docket Entry # 58; quoting Ferrara with emphasis added); see
Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454 (cure refers to
"necessary health-care expenses").

The absence of a prescription for Carr's services and the
lack of evidence that Saco was ordered to stay bed ridden during
the spring of 2006 combine to convince this court that, with the
exception of medical transport, Carr's services were not
necessary health care expenses, i.e., cure.[34]  See Ferrara v. A.

_____

[34]  As discussed infra, maintenance may include a reasonable
amount incurred for the laundry services performed by Carr.
    Defendant classifies Carr's services as cure rather than
maintenance.  The classification is understandable given the
customary association of nursing services with cure.  See De Zon
v. American President Lines, 318 U.S. 660, 668 n. 3 (1943) ("duty
is not to 'cure' in a literal sense, but to provide care,
including nursing and medical attention"); Cabrera Espinal v.
Royal Caribbean Cruises, Ltd., 253 F.3d 629, 631 (11th Cir. 2001)
("cure . . . covers nursing and medical expenses"); see also
Ferrara v. A. & V. Fishing, Inc., 99 F.3d at 454 (cure refers to

& V. Fishing, Inc., 99 F.3d at 454 (cure refers to "necessary health-care expenses").  In other words, with the exception of medically necessary transportation, see Barnes v. Andover Company, L.P., 900 F.2d at 644 (noting, in the context of discussing automobile expenses, "that expenses incurred in connection with medical visits are more appropriately considered part of cure"), Carr's services do not rise to the level of necessary health care expenses.

As to medical transport, a seaman is entitled to receive reimbursement for "transportation expense[s] incurred by him to receive medical care." Haywood v. Jones & McLaughlin Steel Corporation, 107 F.Supp. 108, 112 (W.D.Pa. 1952); accord Travis v. Motor Vessel Rapids Cities, 315 F.2d 805, 813 (8th Cir. 1963) (seaman entitled to receive reimbursement for mileage and expenses of his wife in transporting him to various hospitals) (emphasis added); Hunt v. The Trawler Brighton, Inc., 102 F.Supp. 300, 302 (D.Mass. 1952) (seaman "entitled to recover . . . the cost of transportation to and from the hospital for out-patient treatment"); Robert Force and Martin J. Norris The Law of Seamen, ¶ 26.23 (2006) (cure includes "care, nursing, medicines, medical care, traveling expenses [and] hospitalization").  Defendant agrees to pay $80 for Carr's time spent on March 21, 2006, transporting Saco to an appointment at the Brigham and Women's

---

"necessary health-care expenses").

Hospital in Boston.[35]  Saco is also entitled to the traveling
expenses attributed to Carr on March 3, 2006, for transporting
Saco to and from the same hospital.[36]  Like the taxicab fees
awarded in Hunt, 102 F.Supp. at 300-302, Saco is entitled to
payment of the actual expense incurred provided it was
reasonable.  See generally Hall v. Noble Drilling, Co., 242 F.3d
at 590.  Carr spent eight hours on March 3 and four hours on
March 21, 2006, transporting Saco back and forth to the Brigham
and Women's Hospital.  At a reasonable fee of $20, Saco is
entitled to $240 in actual transportation expenses for the 12
hours of Carr's time.[37]

The remaining categories of services Carr provided consist
of meal preparation, cleaning the apartment, food shopping,
laundry services or changing bed linen and trips to the drug
store and post office.  With the exception of laundry and

---

[35]  The entry for March 21, 2006, depicts Carr spending seven
hours for preparing lunch and dinner and transporting Saco to an
appointment at the Brigham and Women's Hospital.  Considering the
amount of time reasonably spent traveling the 65.6 mile round
trip and the time spent at the appointment results in four hours
of medical transportation time.  The additional three hours is
not compensable because, as discussed infra, meal preparation
does not fall under either cure or maintenance.

[36]  Defendant does not state that it has paid for these
transportation services.

[37]  This court finds that Carr's services do not duplicate
the $1,000 award for the costs of gasoline and insurance.
Defendant concedes as much insofar as it offers to pay $80 for
Carr's services, which represent her time as opposed to the cost
of gasoline and insurance, for the March 21, 2006 visit.

changing bed linen, such services do not fall within the scope of maintenance.

Expenses for laundry are "ordinarily borne by the ship" and therefore includable as maintenance.  Barnes v. Andover Co., L.P., 900 F.2d at 644 n. 9.  At a reasonable fee of $20 per hour, Carr's services are compensable.  The daily entries, however, contain additional time spent on non-compensable items such as meal preparation.  Dividing the time spent each day into the number of tasks that day[38] results in the following figures: March 7 (1.20 hours), March 8 (1.63 hours), March 15 (1.50 hours), March 16 (two hours), March 22 (two hours), March 27 (1.33 hours), March 28 (1.67 hours), April 3 (one hour), April 6 (three hours), April 12 (one hour) and April 14 (three hours). Adding the figures together results in 19.33 hours spent by Carr and incurred by Saco for laundry services which at the $20 rate yields a total of $386.60.

Carr also spent time traveling to the drug store and post office.  Toiletries, however, are not reimbursable expenses. Barnes v. Andover Co., L.P., 900 F.2d at 644 ("we see no reason why automobile expenses other than for medical transport should be bourne by the shipowner in any category or why toiletries should be included as maintenance"); Gillikin v. United States, 764 F.Supp. at 273 (expenses, such as telephone service,

---

[38] Consisting of separate meals, breakfast, lunch and dinner preparation constitutes three tasks.

clothing, toiletries, and travel, are not part of maintenance). Accordingly, Carr's time spent traveling to the drug store and the post office is not compensable.

The time Carr spent preparing meals, food shopping and cleaning the apartment for Saco and his mother also falls outside the scope of maintenance or cure.  Defendant correctly points out that the right to maintenance and cure is personal.  Moreover, as the court in Hodge v. Ocean Quest International, Ltd., 1992 WL 21821 (E.D.La. Jan. 24, 1992), explained:

> [The] defendant should not be obligated to provide [the] plaintiff with every extravagance and comfort for the name of "food and lodging" sake.  The evidence and testimony clearly demonstrates that cost of lodging at an area Travel Lodge Motel, an efficiency apartment at Forest Isle Apartments including . . . three five-course meals of a fine restaurant quality are not expenses which should be considered appropriate to request a "maintenance" increase.

Id., 1992 WL 21821 at * 6.  Meal preparation by a home health aide was not a necessary part of Saco's cure.  Although Saco was casted at the time (Docket Entry # 58, Ex. K), there is no indication that he was not ambulatory or could not walk to the bathroom or to the kitchen to prepare a simple meal.

As a final matter and without case citation, Saco asks for an award of attorney's fees in the amount of one third of the sum awarded to Saco or an amount of $46,875.63.  Saco fails to cite supporting authority or provide an affidavit or other document evidencing the amount of the fees.

In order to receive attorney's fees, a seaman has the burden

to prove that the shipowner "was 'callous, wilful, or recalcitrant' in withholding maintenance and cure payments." Whitman v. Miles, 387 F.3d at 75.  Defendant represents and Saco does not dispute that defendant has paid $23,900 in maintenance and cure to date.  Defendant's conduct falls well short of being callous, wilful and recalcitrant.  Rather, defendant acted entirely reasonably in withholding additional payments.

In sum, Saco is entitled to receive an additional award in the amount of:  (1) $240 for Carr's services transporting Saco to the Brigham and Women's Hospital on March 3 and 21, 2006; (2) $1,025 for the weekly gasoline and insurance expenses incurred for medically necessary physical therapy and medical appointments; (3) $386.60 for laundry expenses for Carr's services; (4) $5 per day for utilities for the period from April 13, 2003 to October 4, 2006 (1,270 days); (5) $6.58 per day for food for the same time period; and (6) $15.81 per day in rent during the same time period.  The daily maintenance rate for utilities, food and rent amounts to $27.39 or $34,785.30 for the 1,270 day period of April 13, 2003 to October 4, 2006.[39]  Adding the amounts in items one, two and three yields a total figure of $36,436.90 of which defendant has paid $23,900.  The difference between these two figures is $12,536.90.

---

[39]  Defendant represents and Saco does not dispute that defendant has paid Saco daily maintenance at the rate of $18.82 for the time period of April 13, 2003 to October 4, 2006. (Docket Entry # 58, n. 7).

CONCLUSION

The motion to increase the amount of maintenance and cure
(Docket Entry # 55) is **ALLOWED** in part and **DENIED** in part.  Saco
reached the point of maximum medical recovery as of October 4,
2006.  He is entitled to receive an additional maintenance and
cure award of $12,536.90.


   /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

37